IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAGNETEK, INC.,                                    )
                                                   )
                        Plaintiff,                 )      Case No.   17 C 3173
                                                   )
        v.                                         )
                                                   )      Judge Robert W. Gettleman
THE TRAVELERS INDEMNITY COMPAY,                    )
TRAVELERS CASUALTY AND SURETY                      )
COMPANY, f/k/a The Aetna Casualty and Surety       )
Company, and VELSICOL CHEMICAL, LLC,               )
                                                   )
                        Defendants.                )

## MEMORANDUM OPINION AND ORDER

Plaintiff Magnetek, Inc. brought a three count complaint against defendants The

Travelers Indemnity Company and Travelers Casualty and Surety Company (together

"Travelers") seeking a declaration that defendants owe a duty to defend (Count I) and indemnify

plaintiff (Count II) under certain insurance policies issued by defendants to plaintiff's

predecessor.   Count III is a claim for breach of contract.   After the court denied Travelers'

motion to dismiss for failure to name Velsicol Chemical LLC as a necessary party [Doc. 31],

Travelers answered and filed a counter-claim, and Velsicol moved for and was granted leave to

intervene as a defendant based on Travelers' assertion that Velsicol[1] has a duty to defend and

indemnify it for any liability asserted in this action.   Plaintiff has now moved for partial

summary judgment on its claim that Travelers has a duty to defend it from certain underlying

claims brought against Monsanto Company that Monsanto asserts plaintiff has a duty to defend

_____

[1] Velsicol was an additional insured under the Travelers policies at issue in this action.

and indemnify based on a "Special Undertaking" Agreement between plaintiff's predecessor and Monsanto. Travelers have countered with a cross-motion for summary judgment arguing that any duty it may have had has been released. For the reasons that follow, plaintiff's motion is granted, and defendant Travelers' motion is denied.

## BACKGROUND

This case presents a complicated background, made all the more complicated because none of the parties have bothered to include a narrative factual description of the case in their legal memoranda. Instead, the parties elected to rely on their Local Rule 56.1 Statements by incorporating them into their briefs. As this court has noted in the past, see e.g. Strychalski v. Baxter Healthcare, Corp., 2014 WL 1154030 *2 (N.D. Ill. March 20, 2014), this practice is both improper and poor lawyering. L.R. 56.1 Statements are not intended to be substitutes for a statement of facts section in a memorandum of law. L.R. 56.1 Statements are to be limited to the material facts and are not to be argumentative. A statement of facts section in a brief is the "'litigant's opportunity to describe the underlying events, provide relevant background information, and persuade the court.'" Id. (quoting Sledge v. Comcast ABB Mgmt. LLC, 2012 WL 2368319 (N.D. Ill. 2012).

The parties' failure to provide background sections in their briefs has left the court without a sufficient description of the underlying events leading to the contracts and documents on which plaintiff bases its claims and Travelers bases its defenses. The parties assume the court is as familiar as the parties with the underlying facts, jumping directly to their legal arguments without providing any context. "Rather than enlightening the court, the briefs have served only to confuse, focusing entirely on the narrow legal issues between the parties without

providing sufficient background information to determine the import of those disputes." Duchossois Indus., Inc. v. Crawford & Co., 2001 WL 59031, *1 (N.D. Ill. 2001). Despite the parties' failures, the court has examined the documents presented to the court, as well as other lawsuits between the parties to inform itself of the background leading to the instant dispute.

In the late 1960s and early 1970s, Northwest Industries Inc. ("NWI") (later known as Fruit of the Loom ("FOTL") owned a company called Universal Manufacturing Corporation ("UMC"). UMC manufactured florescent light fixtures and ballast. UMC used polychlorinated biphenyls ("PCBs") in its products. It purchased the PCBs from Monsanto Company ("Monsanto"). Because of the environmental hazards posed by the use of PCBs, in 1972 Monsanto threatened to cut off UMCs supply unless UMC agreed to enter into a "Special Undertaking" in which UMC agreed to "defend, indemnify, and hold harmless Monsanto, its present, past and future directors, officers, employees and agents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of any such PCBs . . .."

At least in part as a result of UMC entering the Special Undertaking, its parent, FOTL, purchased from Travelers several general liability insurance policies for itself and its subsidiaries, including UMC, which was a named insured on eight separate policies covering October 1, 1969 through October 1, 1970, October 1, 1970 through October 1,1973, October 1, 1969 through October 1, 1973, October 1, 1973 through October 1, 1974, October 1, 1974 through October 1, 1976, October 1, 1973 through October 1, 1976, October 1, 1976 through November 1, 1978 and October 1, 1976 through November 1, 1978.

In January 1986, FOTL sold UMC to plaintiff pursuant to a Stock Purchase Agreement

("SPA"). At the same time, those parties entered into a separate "Environmental Agreement" to

deal with separate environmental matters, particularly with respect to environmental clean-up

obligations at UMC's facilities.

In the following years, FOTL submitted numerous insurance claims to Travelers under

the policies in question, arising out of both UMC's pre-sale activities, as well as claims on behalf

of other named insureds. Many of the claims were disputed and resulted in litigation. See

Velsicol Chem., LLC v. Magnetek, Inc., 2017 WL 2311245 (N.D. Ill. 2017); FOTL v. Travelers

Insurance Co., 284 Ill.App.3d 485, 495 (1st Dist. 1996). In particular, in the early 1990s FOTL

submitted to Travelers certain "Velsicol Environmental Damage Claims" requesting that

Travelers defend and indemnify FOTL with respect to those claims. Velsicol was an additional

named insured with separate limits of liability under each of the policies. Travelers disputed

coverage over the claims, resulting in two lawsuits: (1) FOTL v. Travelers Indemnify Co., No.

91-C-7874 in the Northern District of Illinois; and (2) NWI Land Mgmt Corp. f/k/n Northwest

Indus., Inc. v. Travelers, 95 CH 2912, in the Circuit Court of Cook County, Illinois. In 1999,

Velsicol, FOTL and Travelers entered a settlement agreement resolving their disputes as to

coverage of the Velsicol Environmental Claims, with Travelers essentially paying to FOTL the

remaining Velsicol policy limits and FOTL agreeing to indemnify Travelers from any further

claims.

After the 1999 agreement, another dispute arose between Velsicol, FOTL and Travelers,

this time dealing with certain "Asbestos Bodily Injury Claims" that had been brought against

Velsicol. That dispute resulted in a lawsuit in the Circuit Court of Cook County entitled FOTL

v. Transportation Ins. Co., 97 L 01355 (the "Illinois action"). On June 11, 2004, the parties

entered into a "Settlement and Release Agreement" by which they attempted to settle "all claims

including, without limitation, Environmental Contamination Claims, Asbestos Bodily Injury

claims, the policies and the rights and duties of the parties thereunder as well as matters that were

or might have been raised in the Illinoi action." It is this Settlement and Release Agreement that

forms the basis of Travelers defense to plaintiff's motion for summary judgment and its own

cross-motion for summary judgment.

Meanwhile, a number of claimants have filed lawsuits or otherwise asserted claims

against Monsanto's successors and affiliates ("New Monsanto") alleging bodily injury and

property damage caused by pollution from PCBs that Monsanto had manufactured back in the

1970s. On August 31, 2016, lawyers representing both New and Old Monsanto wrote to

plaintiff demanding that plaintiff defend, indemnify, and hold harmless Old Monsanto in

connection with all current and future PCB- related litigation in which Old Monsanto is or will

be named as a defendant, and for the amount of any resulting judgments and settlements to the

full extent required by the Special Undertaking. The letter formerly tendered the defense of a

number of listed lawsuits. The letter indicated that Old Monsanto "would welcome the

opportunity to discuss the PCB-related litigation . . . and the scope of [plaintiff's] obligations

under the Special Undertaking." The letter further indicated that "New Monsanto expects to put

a process in place for the resolution of this obligation, and those obligations of other similarly

situated parties."

On September 7, 2016, plaintiff tendered notice of the Monsanto demand to Travelers

and requested that Travelers defend and indemnify plaintiff under the applicable Travelers'

policies.   Travelers in turn, tendered plaintiff's demand to Velsicol pursuant to the 1999 and

2004 settlement agreements.

Neither Travelers nor Velsicol agreed to plaintiff's demands, so on April 27, 2017,

plaintiff filed the instant action seeking defense and indemnity.   In addition, to protect itself, two

weeks after filing the instant action, plaintiff sued Monsanto in New Jersey (the "NJ Action")

seeking a declaration that it has no duty to defend nor indemnify Monsanto in the underlying

suits brought against Monsanto.   Several months later, Monsanto responded by suing plaintiff in

Missouri (the "Missouri Action") seeking a declaration that plaintiff owes it a duty to defend and

indemnify.

## DISCUSSION

Plaintiff and Travelers have filed cross-motions for summary judgment on plaintiff's

claim in Count I that Travelers has a duty to defend plaintiff in the "underlying actions."

Summary judgment is appropriate when the moving papers and affidavits show that there is no

genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).   Once a moving party

has met its burden, the nonmovant must go beyond the pleadings and set forth specific facts

showing that there is a genuine issue for trial.   See Fed. R. Civ. P. 56(c); Becker v. Tenenbaum-

Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir. 1990).   The court considers the evidence as a

whole and draws all reasonable inferences in the light most favorable to the party opposing the

motion.   Green v. Carlson, 826 F.2d 647, 651 (7th Cir. 1987).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party."   Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).   The nonmoving party must, however, do more than simply show that there is

some metaphysical doubt about the material facts."   Matsushita Elec. Indus. Co., Ltd. v. Zenith

Radio Corp., 475 U.S. 574, 586 (1986).   "The mere existence of a scintilla of evidence in

support of the [nonmoving party's] position will be insufficient, there must be some evidence on

which the jury could reasonably find for the [nonmoving party]."   Anderson, 477 U.S. at 252.

In the instant case there are few, if any, facts in dispute.   The policies in question have

been provided to the court, as have the SPA and the Environmental Agreement transferring

UMC to plaintiff, as well as the settlements and release documents relied on by Travelers and

Velsicol.   The interpretation of an unambiguous contract is a question of law, and therefore a

dispute over the terms of an unambiguous contract is suited to disposition on summary judgment.

Utility Audit, Inc. v. Horace Mann Serv. Corp., 383 F.3d 683, 687 (7th Cir. 2004).   Under

Illinois law, which all parties agree applies in this case, the construction of an insurance policy

and any determination of the rights and obligations under the policy, including the scope of an

insurers' duty to defend, are questions of law appropriate for resolution on summary judgment.

Crum & Forster Managers Corp. v. Resolution Trust Co., 156 Ill.2d 384, 391 (1993).   In

construing an insurance policy, the court is to ascertain and enforce the intensions of the parties

as expressed in the agreement.   Id.   To ascertain the parties' intent and the meaning of the

words used in the policy, the court must construe the policy as a whole, taking into account the

type of insurance for which the parties have contracted, the risks undertaken and purchased, the

subject matter that is insured and the purposes of the entire contract.   Id.   The court gives the

words in the policy their plain ordinary meaning and does not search for ambiguity where none

exists.   Id.

Under Illinois law, an "insurer's duty to defend its insured is much broader than its duty to indemnify." Outboard Marine Corp. v. Liberty Mutual Ins., Co., 154 Ill.2d 90 (1992). To determine whether an insurer has a duty to defend its insured, the court compares the allegations in the underlying complaint with the relevant coverage provisions of the policy. Native Am. Arts, Inc. v. Hartford Cas. Ins. Co., 435 F.3d 729, 732 (7th Cir. 2006). If the facts alleged in the underlying action fall within, or even potentially within, the policy's coverage provisions the insurer must defend the insured. Id. The court must construe the allegations of the underlying complaint liberally and any doubt about coverage must be resolved in favor of the insured. Id. Additionally, if the underlying complaint asserts several theories of recovery against the insured, the insurer's duty to defend arises "even if only one such theory is within the potential coverage of the policy." U.S. Fidelity & Guar. Co. v. Wilkin Insulation Co., 144 Ill.2d 64, 73 (1991).

In its motion for summary judgment, plaintiff seeks a declaration that Travelers has a duty to defend plaintiff in what plaintiff calls the "Monsanto Litigation," consisting of plaintiff's suit against Monsanto in the New Jersey action and Monsanto's suit against plaintiff in the Missouri action. The parties appear to agree that the claims asserted in those actions, which ask those respective courts to decide whether plaintiff has a duty to defend or indemnify Monsanto in the "underlying actions," at least partially fall within the coverage provisions, because none of the parties have actually compared the Monsanto Litigation complaints to the policies' coverage provisions. Instead, the parties focus their arguments on the potential applicability of certain exclusions and other defenses.

Travelers' first argument is that the court should not even consider the Monsanto Litigation, or plaintiff's argument that the court should order Travelers to defend plaintiff in

those cases, because neither of the cases had commenced when plaintiff brought the instant litigation, and neither of those cases is expressly referenced in the instant complaint.

In response, plaintiff first points out that the subject of the instant complaint was Monsanto's tender to and demand on plaintiff to at least participate in the defense of the underlying actions against Monsanto. The instant complaint specifically alleges that "Travelers owes [plaintiff] a duty to defend the claims by the Monsanto successors relating to the Underlying Actions as well as any other current or future PCB-related claims relating to or arising from occurrences during the Policy periods." It argues that the court can consider new legal arguments and matters on a motion for summary judgment, so long as the complaint's factual theory is not altered, and doing so would avoid unreasonable delay and minimize cost. See BRC Rubber & Plastics, Inc. v. Con't. Carbon Co., 900 F.3d 529, 541 (7th Cir. 2018). In any event, plaintiff has also moved to amend the complaint nunc pro tunc to add allegations relating to the Monsanto Litigation. Under Fed. R. Civ. P. 15, it likely has a right to do so and, even if the court were to deny the motion, plaintiff would likely file a new lawsuit which would then be consolidated with the instant suit. Thus, to avoid unnecessary delay, the court considers plaintiff's claims. Travelers correctly points out that its duty to defend extends only to "suits" brought against its insured and that Monsanto's demand letter does not constitute a suit triggering the duty to defend. See FOTL v. Travelers, 284 Ill.App.3d at 495. Of course, the Monsanto Litigation has now commenced, and plaintiff's defensive declaratory action in the New Jersey action and its defense of the Missouri action can trigger the duty to defend.

Travelers next argues that it has no duty to defend the underlying actions against Monsanto because plaintiff is not named in those suits and Monsanto is not a named insured

under any of the policies.   Travelers argues that what plaintiff is really seeking is not a defense,

but rather reimbursement for anything it might ultimately be responsible for under the Special

Undertaking.   According to Travelers, this is not covered under the general liability provisions

of the policies, but admits that it might be covered under the contractual liability provisions.   In

either event, Travelers argues that such a claim is for indemnity, not defense.

It is not entirely clear that plaintiff is asking the court to decide that Travelers must

defend Monsanto in the underlying actions, but as plaintiff points out, each policy contains a

contractual liability provision that provides (emphasis added):

> The Travelers agrees to pay on behalf of the Insured all sums under which the
> Insured shall be legally obligated to pay by reason of liability imposed by law
> upon Insured or <u>assumed by the Insured under any contract</u>, for damages because
> of bodily injury, malpractice injury, advertising injury or property damage, caused
> by or arising out of any occurrence.

In addition, the policies further provide that Travelers will defend any suit alleging such

injury or damage and seeking damages payable under the terms of the policy.   Thus, the

contractual liability section of the policy also provides for defense of claims for which the

insured is contractually liable.

Travelers next argues that by filing the New Jersey action, plaintiff violated its "duty to

cooperate" under the policies.   Each of the policies contains a clause similar or identical to the

following:

> The Insured shall cooperate with Travelers and, upon request, attend hearings and
> trials and assist in making settlements, securing and giving evidence . . ..   The
> Insured shall not, except at its own cost, voluntarily make any payment, assume
> any obligation or incur any expense other than for such immediate medical and
> surgical relief to others as shall be imperative at the time of an occurrence.

10

According to Travelers, by filing the New Jersey action and starting the Monsanto Litigation, plaintiff assumed an obligation to defend at its own expense. As plaintiff points out, however, by the time it filed the New Jersey action, it had already tendered Monsanto's demand to Travelers, and Travelers had already rejected any responsibility under the policies to indemnify or defend. Thus, Travelers could not possibly be prejudiced by plaintiff's efforts to protect itself. See Xtreme Prot. Servs., LLC v. Steadfast Ins. Co., 2019 Il. App. (1st) 181501 ¶34 (1st Dist. May 23, 2019) (To avoid responsibility under the policy insurer must show that it was prejudiced by insured's failure to cooperate. "Proof of such prejudice requires an insurer to demonstrate that it was actually hampered in its defense by the violation of the cooperation clause." M.F.A. Mut. Ins. Co. v. Cheek, 66 Ill.2d 492, 500 (1973)). Travelers has failed to demonstrate that it has been prejudiced in any way.

Finally, Velsicol argues that plaintiff is not entitled to summary judgment because it has failed to address Velsicol's affirmative defense based on the "Known Loss Doctrine." This doctrine provides that a risk is uninsurable if the insured knew or had reason to know when it purchased the policy that there was a substantial probability that it will suffer or already suffered a loss, because the risk ceases to be contingent and becomes a probable or known loss. Such a loss is uninsurable because the risk of liability is no longer unknown. Outboard Marine, 154 Ill.2d at 103.

In the instant case, there is no evidence that FOTL (NWI) or even UMC knew, at the time the insurance was purchased, that Monsanto would be sued years later based on allegations that the PCBs that it sold to UMC would be released from UMC's final product, which is what the underlying actions against Monsanto allege. Nor could UMC (or plaintiff) have known that it

would be sued for negligently releasing PCBs as Monsanto alleges against plaintiff.    Thus, the court rejects Velsicol's argument that the Known Loss Doctrine applies.

That brings the court to Travelers' primary argument both in opposition to plaintiff's motion and in support of its own motion for summary judgment.    According to Travelers, all of its obligations under the policies were released in the 2004 Settlement and Release Agreement. Additionally, it argues that under the terms of that agreement, all of the policies were deemed exhausted.

As noted above, Velsicol was an additional insured with its own separate policy limits under each of the policies in question.    In 1999 Travelers, Velsicol and FOTL settled the coverage issues relating to the "Velsicol Environmental Claims," and in 2004 they settled their coverage issues relating to certain Asbestos Bodily Injury Claims that had been brought against Velsicol by entering into the Settlement and Release Agreement.    The purpose and scope of that agreement was specifically stated as:

> **(1) <u>Purpose and Scope</u>**    The purpose and scope of this agreement are:    (i) to resolve all past, present and insurance coverage disputes between the Velsicol entities and Travelers in connection with Environmental Contamination Claims, Asbestos Bodily Injury Claims and any other Claims; (ii) for Travelers to buy back all of the Velsicol Entities' rights and entitlements, if any, under the policies; (iii) for the Velsicol Entities to fully and finally release, relinquish and surrender all of their rights of coverage under said Policies; and (iv) for the Parties to procure consent to this Agreement of the United States and the States of Illinois, New Jersey, Michigan and Tennessee.

For purposes of the Agreement, FOTL was defined as FOTL Inc., and included a large number of related entities including "any Person insured by any of the Policies."    Because UMC (now plaintiff) was a named insured, Travelers argues that any rights that UMC may have had under the policies were fully and finally released in the Agreement.    In support of this argument,

it cites a number of cases that, not surprisingly, hold that a parent that purchases insurance for its wholly owned subsidiary can release the subsidiary's rights under the insurance.   See e.g. Gen. Acc. Ins. Co. of Am. v. Old Republic Int'l Corp., 648 F.Supp. 634, 637 (N.D. Ill. 1986).

Similarly, Travelers argues that in the Settlement and Release Agreement, the parties deemed the policies exhausted.   There is no doubt that parties to an insurance agreement can agree to exhaustion even if the policy is not actually exhausted by full payment of the policy limit.   And, like a release, a parent can agree to deem a policy exhausted on behalf of its subsidiaries.   See Elliott Co. v. Liberty Mut. Ins. Co., 434 F.Supp.2d 483, 499 (N.D. Ohio 2006).   And, again not surprisingly, an insurer has a right to settle or pay claims on behalf of any insured pursuant to a settlement, even if the settlement results in full exhaustion of the policy limits to the detriment of other insureds, so long as the insurer has acted in good faith.   See Stryker Corp. v. XL Ins. America, Inc., 2018 WL 3950899 at *9 (W.D. Mich. Aug. 17, 2018).

The problem with Traveler's argument is that at the time of execution of the 2004 Settlement and Release Agreement, FOTL no longer owned or controlled UMC (plaintiff), one of the named insureds, having sold it in 1986.   Thus, absent something in the SPA or Environmental Agreement, FOTL had no authority to release UMC's rights under the policies. Travelers argues that a parent can agree to exhaust the policy to the detriment of a former subsidiary.   It relies on Elliott for this proposition.   The Elliott court stated (434 F.Supp.2d at 500) that:

> [A]nother insured is more likely to be prejudice by exhaustion of the policy limits. Nonetheless, an insured should be allowed to exhaust a policy by good faith agreement, even if payments do not exceed the policy limits.   A contrary holding would discourage the reasonable settlement of disputes.

The settlement agreement in Elliott, however, fully exhausted the policy limits and the quoted language is dicta preceded by the statement, "[a]ssuming for the sake of argument that the policies were not actually exhausted . . ." Id. at 500. In any event, this court respectfully disagrees with Elliott, and finds the reasoning In re Forty-Eight Insulations, Inc., 133 B.R. 973, 979 (Bank. N.D. Ill. 1991), more persuasive. In In re Forty-Eight, an additional insured attempted to release the rights of the named insured. The court found that when the named insured purchased the policies it assumed the risk that the policies might be exhausted by claims made by the additional insureds, not that its rights would be extinguished by a separate agreement between one of the additional insureds and the insurer. In reaching this conclusion, the court rejected the additional insureds' argument based on UNR Indus. Inc. v. Continental Casualties Co., 942 F.3d 1101 (7th Cir. 1991), stating (id. at 980):

> If the Debtor here and the insurers want to settle their own coverage disputes, they may do so. But nothing in Continental Casualties allows them to extinguish by agreement among themselves and this Court, the contract rights of another insured not a party to that settlement. If the policies are, in fact, exhausted, by settlement or otherwise as a result of tort claims against Forty-Eight, then FWC may have no further rights under the policies. But that would be a consequence of the contractual limitations on FWC's rights that it agreed to when it bought the policies. It would not be the consequence of this Court's abrogation of those rights pursuant to a settlement between other parties.

That reasoning applies equally to the instant case, especially because the policies do not distinguish between the first named insured and other named insureds like UMC. Thus, the court concludes that absent a provision in the sale documents reserving that right to FTOL, it lacked authority to release UMC's rights.

Section 9.6(b) of the SPA provides that "Seller shall and hereby does, effective as of the Closing, transfer, assign, and convey to the Company [UMC] all rights of Seller against any

14

insurer providing coverage under any such Insurance Policy with respect to any liability of any

of the company or either Subsidiary . . ..." Thus, under the SPA, UMC's rights under the

policies were "assigned" to UMC. Travelers argues that Section 6 of the Environmental

Agreement pulled back those rights:

> (a) Subject to Subsection (b) below, and the provisions of Section 9(b) of the
> [SPA] to the contrary notwithstanding, Seller retains all rights against the insurers
> providing coverage under any Insurance Policy to the extent of any liability for
> which Seller has hereunder provided reimbursement or indemnification under this
> Agreement.

The Environmental Agreement, however, concerned environmental issues at UMC's

plants and facilities, and covered costs of both compliance and clean-up obligations. It did not

purport to deal with the types of claims presented in the instant case. Thus, the court concludes

that Section 6 does not affect plaintiff's rights under the policies and further concludes that

FOTL had no ability to release plaintiff's rights under the policies or to agree to deem the

policies exhausted on plaintiff's behalf.

In its own motion for summary judgment, Travelers also argues that plaintiff released all

of the rights that it claims it received under the UMC sale documents in a settlement agreement

that it entered into in 2001 in the NWI/FOTL Bankruptcy Proceeding. In that release, the

releasing parties agreed to release any claim "which any of the Releasing Parties ever had or may

have against the Released Parties pursuant to the Magnetek agreements [including the UMC sale

documents] and the Magnetek Judgment, and with respect to the matters addressed in the

Magnetek agreement and Magnetek Judgment."[2]

---

[2]True to form, none of the parties has presented the court with any background as to the FTOL
bankruptcy or the Magnetek agreements and judgments referenced. Apparently, Magnetek had

The court disagrees with Travelers' position that the 2001 settlement agreement between plaintiff and FTOL released any claims plaintiff may have against Travelers. A review of that agreement shows that it was intended to settle a dispute between plaintiff and FOTL over FOTL's refusal to pay the entirety of plaintiff's 1988 judgment against it. In particular, after paying a portion of the judgment, FOTL sued plaintiff for reimbursement of certain tax savings that plaintiff realized as a result of FOTL's payments under the SPA and judgment. The purpose of the settlement was to resolve that lawsuit and create a mechanism to share any tax savings. The release had nothing to do with any claims against Travelers under the insurance policies.

Next, Travelers argues that questions of facts exist as to the application of two of its affirmative defenses, requiring denial of plaintiff's motion. Once again, the court disagrees. First, Travelers argues that the "Pollution Exclusion" found in some, but not all, of the policies in question "has been found to apply in litigation between Travelers and FOTL regarding PCB contamination at and around UMC's former Bridgeport plant." The policy exclusion provides:

(i) It is agreed that the insurance does not apply

(1) to bodily injury or property damage arising out of any emission, discharge, seepage, release or escape of any liquid, solid, dashes or thermo waste or pollutant

(a) if such emission, discharge, seepage, release or escape is either expected or intended from the standpoint of any insured or any person or organization for whose acts or omission any insured is liable, or

─────────────────────

obtained a judgment against FOTL sometime in 1988 for violating the indemnity provisions of the SPA.

16

(b) resulting from or contributed to by any condition
in violation of or non-compliance with any
governmental rule, regulation or law applicable
thereto;

But this exclusion (1) does not apply to property damage arising out of any
omission, discharge, seepage, release or escape of petroleum derivatives into any
body of water; . . ..

In FOTL, Inc. v. The Travelers Indemnity Co., 284 Ill.App.3d 485 (1st Dist. 1996),

FOTL sued Travelers seeking a declaration that Travelers had breached its duty to defend FOTL

against a claim by the Connecticut Department of Environmental Protection regarding PCBs and

UMC's Bridgeport plant.   The court granted Travelers' motion for summary judgment, holding:

(1) that the Department's demand letter did not constitute a suit so as to give rise to a duty to

defend; and (2) the pollution exclusion barred coverage because "to claim that such discharges

and releases [of PBCs] was unexcepted is disingenuous."   Id. at 498.

Travelers argues that the FOTL decision demonstrates that UMC understood and

expected the hazards of PCB contamination.   According to Travelers, this expectation creates a

question of fact as to the application of the Pollution Exclusion.   That FOTL decision, however,

dealt with PBC spills and resulting contamination at the Bridgeport facility.   The underlying

cases brought against Monsanto assert bodily injury allegedly resulting from PCBs leaking from

UMC's final product in numerous locations.   Nothing in the FOTL decision suggests, in any

way, that the exclusion should apply to the instant case.   Certainly, its application is not "clear

and free from doubt" given the claims in Monsanto Litigation and the claims brought against

Monsanto.   Provisions that limit or exclude coverage are to be construed strongly against the

insurer and liberally in favor of the insured.   Pekin Ins. Co. v. Wilson, 391 Ill.App.3d 505, 517

(5th Dist. 2009).   Consequently, because no facts have been presented to indicate that the exclusion might apply, and because some of the policies do not even contain the exclusion, the court rejects Travelers' argument that questions of fact about the exclusion requires denial of plaintiff's motion.

Travelers also argues that questions of fact exist as to whether any alleged bodily injury or property damage took place during the policy periods.   This is a non-starter.   That is one of the issues being litigated in the Monsanto Litigation that triggers the duty to defend.   The underlying suits allege releases from UMC's final products.   UMC purchased the PCBs and manufactured those products during the policy periods.   See Aetna Casualty & Surety Co. v. O'Rourke Bros., Inc., 333 Ill.App.3d 871, 879 (3d Dist. 2002) (Because products sold during policy period, the injuries could have potentially occurred within that period.).

Consequently, for all the reasons discussed above, the court concludes that Travelers has a duty to defend plaintiff in the Monsanto Litigation.   Ordinarily, under Illinois law, the duty to defend includes the right to control the defense to allow insurers to protect their financial interest in the outcome of the litigation and to limit or minimize unwarranted liability claims.   Illinois Masonic Med. Center v. Turegun Ins. Co., 168 Ill.App.3d 158, 163 (1st Dist. 1998).   Exceptions apply, however, when a significant conflict of interest exists such that when comparing the allegations of the complaint to the terms of the policy, the insurer's interest would be furthered by providing a less than vigorous defense to the allegations.   Id.   Such conflicts have been found where the underlying complaint asserts claims that are covered as well as others which the insurer is required to defend but asserts are not covered by the policy.   Id.   The usual conflict of interest involves the insurer denying coverage, but the principle is the same when the conflict

18

arises from the relation of the policy limit to the insureds potential liability.   Perma-Pipe, Inc. v. Liberty Surplus Ins. Corp., 38 F.Supp.3d 890, 895 (N.D. Ill. 2014) (citing R.C. Weigman Const. Co. v. Admiral Ins. Co., 629 F.3d 724, 729 (7th Cir. 2011)).   Thus, a conflict exists when there is a "nontrivial probability" of an excess judgment in the underlying suit.   Id.

Such a nontrivial probability exists in the instant case.   Monsanto has already suffered a $47,000,000 judgment, has settled another group of claims for $280,000,000 and faces additional lawsuits.   It seeks indemnification from plaintiff for all amounts it has paid in connection with those claims.   Plaintiff disputes that it could be held liable to Monsanto for those amounts, but the claims at issue in the Monsanto Litigation far exceed the policy limits.   Consequently, the court concludes that plaintiff is entitled to control its defense.

## CONCLUSION

For the reasons stated above, the court grants plaintiff's motion for partial summary judgment [Doc. 68] and denies Travelers' motion for summary judgment [Doc. 85].   The court thus holds that: (a) Travelers has a duty to defend plaintiff Magnetek in the Monsanto Litigation; (b) Magnatek may control its defense in that litigation; and (c) Travelers shall reimburse

Magnetek for defense costs, past and future, in that litigation.   The court also grants plaintiff's motion to file an amended complaint nunc pro tunc [Doc. 93].


**ENTER:        July 11, 2019**


_Robert W. Gettleman_
**Robert W. Gettleman**
**United States District Judge**